UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

**FRANCISCO OSCAR SILVESTRI,**

     **Petitioner,**

**v.**

**MARA MONICA OLIVA,**

     **Respondent.**

05-CV-2382 (WJM)

**OPINION
FOR PUBLICATION**

---

Christopher M. Strongosky
DLA Piper Rudnick Gray Cary US LLP
379 Thornall Street, 8th Floor
Edison, New Jersey 08837
*Attorney for Petitioner*

Christopher W. Hyde
Winterberry Farm
118 Parker Road
Chester, New Jersey 07930
*Attorney for Respondent*

**MARTINI, U.S.D.J.:**

     Petitioner Francisco Oscar Silvestri ("Petitioner" or "Silvestri") brought this action before

the Court under The Convention on the Civil Aspects of International Child Abduction (the

"Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42

U.S.C. § 11601 *et seq.*  Silvestri seeks an order requiring that his three minor children –

Marianela Ivana, Antonella Lucia and Macarena Oriana Silvestri – be returned to Argentina for

determination of custodial rights.  Silvestri brought this action against Respondent Mara Monica

Oliva ("Respondent" or "Oliva"), his former wife and the mother of the three children, with

whom the children currently reside in the United States.  This matter came on for trial on

1

November 22, 2005.  The Court heard testimony from both Silvestri and Oliva and argument

from both sides and received exhibits.  Based on the foregoing evidence, and for the reasons

explained below, Silvestri's petition is **DENIED** and the Court will not issue an order requiring

the return of the children to Argentina.

## FINDINGS OF FACT[1]

Preliminarily it is worth noting that much of the evidence presented to the Court upon

which it must make its determination was the testimony of Petitioner Silvestri and Respondent

Oliva.  As such, the Court independently evaluated the credibility of each witness.  The Court

took into account each witness' demeanor while testifying, the ability of each witness to recall

and explain events and things, the reasonableness of each witness' testimony in light of the other

evidence presented, and whether each witness' testimony was contradictory or consistent with

their own testimony, the testimony of the other witness, or the other evidence presented.[2]  Overall

the Court found the testimony of Oliva to be more credible.  To the extent that Silvestri's

testimony contradicted or conflicted with Oliva's testimony, the Court credited Oliva's testimony

except as otherwise noted.

Petitioner Silvestri is a citizen of Argentina living in Argentina.  Respondent Oliva is a

citizen of Argentina currently living in New Jersey.  Both parties were born in Argentina.  They

married in Argentina and lived in Vicente Lopez, a city outside of Buenos Aires.  They had three

---

[1]To the extent any findings of fact are more appropriately categorized as conclusions of law, and vice versa, they are adopted as such.

[2]*See Sasson v. Sasson*, 327 F. Supp. 2d 489, 490 n.2 (D.N.J. 2004).

children:  Marianela Ivana, Antonella Lucia and Macarena Oriana, who are now fourteen, twelve

and nine years old respectively.

The children's relatives, including their grandparents, aunts, and uncles, live in

Argentina.  Besides the Respondent, no other relative lives in the United States.  When the

children lived in Argentina, they saw their relatives infrequently because they lived far away.

Petitioner and Respondent visited the United States every year for approximately ten

years before 2003.  During that time period, Respondent talked repeatedly about moving to the

United States.

Petitioner worked and continues to work for a small family business which belongs to his

father.  In 2001, the business faced hard times due, at least in part, to the fact that Argentina was

experiencing an economic crisis.  The value of the family business plummeted, dropping to one-

third of what it had previously been worth.  It was at that time that Petitioner and Respondent

began to formulate a plan to move to the United States.  The plan was to live in the United States

on a conditional basis and, after some undefined period of time, decide whether they wished to

remain in the United States or return to Argentina.

The Petitioner and Respondent believed that their easiest route to the United States

involved Respondent getting a work visa, which would then allow Petitioner and the children to

obtain derivative visas.  In order to obtain a work visa, Respondent needed to find a job sponsor.

Respondent was and is a mental health professional, employed as a therapist.  She interviewed

for a position at the Metropolitan Center for Mental Health, Hispanic Family Services division

on February 21, 2001.  Metropolitan Center agreed to sponsor her.  On March 11, 2002,

Respondent's attorney began the process to obtain a work visa.  In December 2002, her work visa was approved.

Because Respondent spoke English better than Petitioner, it was decided that she would come to the United States alone to secure a place for the family to stay and establish herself before Petitioner and the children followed her up.  Petitioner and Respondent decided to have the two-bedroom house in Argentina appraised so they could put it up for sale.  Petitioner intended to establish a business in the form of a café in the United States, and the couple planned on using the proceeds from the sale of their house as seed money for that business.

On February 25, 2003, Respondent arrived in the United States, specifically, New Jersey. She leased a two-bedroom apartment for one year.  She began working full time as a therapist at Metropolitan Center in April 2003.  While Respondent was busy establishing a foothold in New Jersey, the Petitioner remained in Argentina making the final preparations to move to the United States.  He was responsible for preparing the contents of their house in Argentina for the move. He arranged to have approximately 20 % of their furniture, including the family's beds, as well as other belongings, e.g., dishes, pictures, books, photo albums and dolls, shipped by boat to the United States.  As a result of the beds being shipped before the Petitioner and children moved, they spent their remaining days in Argentina sleeping on the floor of the house.  Petitioner also shipped a portion of his miniature car collection, which he intended to use as decoration in the café he planned on opening in the United States.

The children began attending school in Argentina at the age of five years old.  The Argentine school year runs from the beginning of March through December each year.  They

attended school in Argentina up to March 2003, when Petitioner removed them from school to move to the United States.

On March 22, 2003, Petitioner and the children came to the United States, using round-trip tickets, returnable four days later.  Respondent picked them up at Newark International Airport in New Jersey.  Petitioner testified that on their way from the airport to the apartment he informed Respondent that he did not want to live in the United States and wanted the children to return with him to Argentina.  The Court however finds that testimony incredible.  Petitioner himself brought the children to the United States.  If it was his intention to keep the children in Argentina, he could have left the children in Argentina with relatives, where they could have remained in school, and come up by himself.  Instead, Petitioner removed the children from their schools, after they had just begun a new school year, and moved them to the United States.  And within one week of their arrival, the children were enrolled in school.  Petitioner himself frequently took the children to and from school.  Moreover, Petitioner applied for a New Jersey driver's license several times.  Although he never passed the test, his repeated efforts to obtain a license, as well as the other facts surrounding his move to the United States, belie Petitioner's assertion that he immediately objected to and opposed establishing roots in the United States.  Rather, they demonstrate that he acted pursuant to the plan that he and Respondent developed while living in Argentina.

Petitioner stayed in the New Jersey for two months.  During that time, he apparently became uncomfortable with the size of the apartment, which was small relative to the house in Argentina, and with the fact that they had to sleep on the floor for some time while the family's beds were in transit.  Essentially, Petitioner appears to have had some problems adapting to

living in the United States.  In May 2003, Petitioner expressed his intention to return to

Argentina, but in doing so, he did not object to the children staying in the United States at that

time.  Rather, he explained that he needed to take care of some business in Argentina and that

afterwards he would return.  In response, Respondent expressed her intent to remain with the

children in the United States.  Petitioner left for Argentina using a round-trip airplane ticket.

In late May, early June 2003, Petitioner returned to the United States.  At some point

thereafter, in what appears to be early June, Petitioner informed Respondent that he wanted

everyone to return to Argentina.  Respondent told Petitioner that she and the children would

remain in the United States.  Subsequently, and for reasons that are disputed but need not be

explained, Petitioner and Respondent had a severe argument that degenerated into a physical

confrontation.  That confrontation effectively ended their marriage.  Within a day of that

confrontation, Petitioner left the United States without the children and returned to Argentina

where he has resided since.

In October 2003, when Respondent learned that Petitioner intended on visiting the

children in New Jersey, Respondent sought a temporary restraining order against Petitioner

predicated on the confrontation in June and sought a formal declaration of custody of the

children.  On October 9, 2003, the temporary restraining order issued temporarily awarding

custody of the children to Respondent pending a final hearing.  Respondent visited New Jersey in

October and saw his children for approximately twenty to thirty days.

In February 2004, Respondent initiated divorce proceedings in a State court in Bergen

County, New Jersey.  On July 6, 2004, the Bergen County court issued an order dissolving the

Petitioner's and Respondent's marriage and awarding custody of the children to Respondent.  On

March 15, 2005, Respondent further obtained an order that prohibited Petitioner from removing the children from the State of New Jersey.  Apparently Petitioner did not make an appearance to oppose these proceedings.

The Respondent and children have remained in the same town and the children have attended the same school system since moving to New Jersey in 2003.  The children have put down roots in their community.  They are fluent in English, and speak in English except when speaking with their mother.  Respondent insists that they speak with her in Spanish so they do not forget their first language.  Nonetheless, they take classes in English, speak to their friends in English, and sometimes have difficulty expressing themselves in Spanish.  The children have also done well in school, having received good grades and recognition for their progress and performance.

The children have made friends in school as well as friends they see after school. Specifically, Macarena, the youngest, is particularly close to her neighbor, Sharon, with whom she spends time with after school doing homework and socializing.  Antonella, the middle child, has two close friends with whom she spends her afternoons.  And Marianela, the eldest, has three close friends that she associates with outside of school.

Through their father, the children also maintain a limited number of friends in Argentina. Since June 2003, the father has visited the children eight times.  Generally, he visits for two to three weeks per trip and times his visits to coincide with the children's birthdays.  Respondent has permitted the children to see and stay with Petitioner when he visits.

Respondent's work visa expires in 2008.  Respondent filed for permanent resident status in December 2003, and has represented that if she does not acquire permanent resident status

before the expiration of her work visa, she will request that her work visa be extended.

Respondent remains employed at two different locations – a mental health clinic in Manhattan

and a hospital – where she works as a therapist.

In August 2004, Petitioner submitted an application for return of the children under the

Hague Convention before an Argentine authority.  The outcome of that application, if any, is

unclear.  On May 6, 2005, Petitioner filed his petition in this case seeking the return of his

children to Argentina under the Hague Convention and ICARA.  After the parties completed

discovery, the Court held a one-day bench trial as described above.[3]

## CONCLUSIONS OF LAW

**A.      The Hague Convention Framework**

The objective of the Hague Convention is to "protect children internationally from the

harmful effects of their wrongful removal or retention and to establish procedures to ensure their

prompt return to the State of their habitual residence, as well as to secure protection for rights of

access."  Hague Convention, Preamble.  Both the United States and Argentina are signatory

nations.

The Hague Convention is implemented by ICARA, 42 U.S.C. § 11601 *et seq*., which

"empower[s] courts in the United States to determine only rights under the Convention and not

the merits of any underlying child custody claims."  42 U.S.C. § 11601(b)(4); Hague Convention,

---

[3]It is worth noting that the Court did not have the benefit of hearing testimony from the children.  In any event, given their ages, there is no certainty that they would have been competent to testify.  *See* Hague Convention, Art. 13 (stating that a court may take into account a child's objections if the child "has attained an age and degree of maturity at which it is appropriate to take into account" his or her views).

Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken

to be a determination on the merits of any custody issue.").  This Court has jurisdiction over

Silvestri's petition pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a).

In an action brought under the Hague Convention and ICARA, the petitioner bears the

burden of showing by preponderance of the evidence that "the child has been wrongfully

removed or retained within the meaning of the Convention".  42 U.S.C. § 11603(e)(1)(A).  Under

the Convention, the removal or retention of a child is wrongful when:

> *a* it is in breach of rights of custody attributed to a person, an
> institution or any other body, either jointly or alone, under the law
> of the State in which the child was habitually resident immediately
> before the removal or retention; and
>
> *b* at the time of removal or retention those rights were actually
> exercised, either jointly or alone, or would have been so exercised
> but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a* above may
> arise in particular by operation of law or by reason of a judicial or
> administrative decision, or by reason of an agreement having legal
> effect under the law of that State.

Hague Convention, Art. 3.  "Rights of custody" include "rights relating to the care of the person

of the child and, in particular, the right to determine the child's place of residence."  Hague

Convention, Art. 5a.

If the petitioner meets his burden, the burden shifts to the respondent opposing the return

of the child to establish one of four affirmative defenses: (1) by clear and convincing evidence

that there is a grave risk that the child's return would expose the child to physical or

psychological harm or place the child in an intolerable situation;[4] (2) by clear and convincing

---

[4]Hague Convention, Art. 13b; 42 U.S.C. § 11603(e)(2)(A).

evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms";[5] (3) by a preponderance of the evidence that the proceeding was commenced more than one year after the date of wrongful removal or retention and the child is now settled in his or her new environment;[6] and (4) by a preponderance of the evidence that the petitioner was not actually exercising his custody rights at the time of removal or retention, or "had consented to or subsequently acquiesced in the removal or retention".[7]

**B.      The Children Were Habitual Residents of the United States Prior to Retention**

The threshold issue the Court must grapple with is what was the habitual residence of the children immediately prior to their retention in the United States.  *See Feder v. Evans-Feder*, 63 F.3d 217, 222 (3d Cir. 1995).  Although the "habitual residence" of a child is not defined by the Hague Convention, the Third Circuit has defined it as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  *Id.* at 224.  This determination focuses on "the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  *Id.*  The determination of a child's habitual residence is a mixed question of law and fact.  *Delvoye v. Lee*, 329 F.3d 330, 332 (3d Cir. 2003).

---

[5]Hague Convention, Art. 20; 42 U.S.C. § 11603(e)(2)(A).

[6]Hague Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B).

[7]Hague Convention, Art. 13a; 42 U.S.C. § 11603(e)(2)(B).

Here, the Petitioner argues that the children's habitual residence prior to retention was

Argentina.  In so arguing, Petitioner takes the position that the children were wrongfully retained

as of his arrival in the United States on March 22, 2003, when he allegedly told the Respondent

that he had no intention of living in the United States and he wanted the children to return with

him to Argentina.  The Court, however, finds the Petitioner's testimony to be less than credible.

As stated above, Petitioner's actions prior to his arrival and subsequent to his alleged objection to

remaining in the United States belie that testimony.  *See Mozes v. Mozes*, 239 F.3d 1067, 1075

(9th Cir. 2001) (stating that "one's actions may belie any declaration that no abandonment was

intended").

Rather, the Court finds that the retention occurred in early June 2003.  Prior to that time,

Petitioner may have expressed qualms about living in the United States, but there is no credible

evidence of record that he definitively objected to living in the United States or the children

remaining in the United States.  It was not until early June 2003, after he returned from his trip to

Argentina, that he insisted the children go back to Argentina with him.  Respondent refused,

telling the Petitioner that the children would remain with her in the United States.  A

confrontation erupted that resulted in the Petitioner leaving the house immediately and leaving

the country the next day without his children.  At that time, the marriage for all practical

purposes ended.  And it was at that time that a retention could be said to have occurred.  That

being the case, the issue is what was the habitual residence of the children immediately prior to

early June 2003.

In *Whiting v. Krassner*, 391 F.3d 540 (3d Cir. 2004), the Third Circuit discussed the three

broad categories of fact patterns that give rise to cases under the Hague Convention where

11

habitual residence is an issue. *Id.* at 549. The three categories are: (1) "the situation in which the court finds that the family as a unit has translocated and 'manifested a settled purpose to change its habitual residence, despite the fact that one parent may have had qualms about the move'"; (2) the situation in which the "petitioning parent initially agreed to allow the child to stay abroad for an indefinite duration"; and (3) the situation where "the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration." *Id.* at 549 (quoting and citing *Mozes*, 239 F.3d at 1076-77). This case most closely resembles the first category. As the Third Circuit recognized, cases falling within that category usually lead courts to find a change of habitual residence. *Id.*

The determination of a child's habitual residence is informed by the circumstances surrounding the child's living environment prior to retention and the parents' shared intentions (or purpose) regarding their child's presence there. *See Feder*, 63 F.3d at 224. Addressing the latter factor first, a settled purpose need not be an intent to remain in a location permanently; rather, it is sufficient if the purpose is to remain in a location for a limited period of time. *See id*. ("That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's settled purpose to live as a family in the place where Mr. Feder had found work."); *Sasson*, 327 F. Supp. 2d at 500 ("[E]ven if, as Petitioner maintains, he and Respondent only intended to live in the United States for a 'prolonged' but limited period of time while trying to resolve their marital problems, rather than permanently, that intent is still sufficient to establish a new habitual residence."). Here, the evidence of record demonstrates the parties' shared purpose was to discard Argentina as the habitual residence, and at least for a limited period of time, acquire a new habitual residence in

12

the United States.  The parents began making plans to move to the United States in late 2001 due to the economic crisis in Argentina.  Respondent acquired a job sponsor and filed for and was granted a work visa to work at a mental health facility as a therapist.  Pursuant to their plan, Respondent came to the United States to pave the way for the rest of the family; she leased an apartment for one year, and began working full-time.

Meanwhile, Petitioner readied the house and belongings in Argentina for the move.  He had the house appraised with the purpose that when they sold the house, he would use the proceeds to open a café in the United States.  Further, he shipped a portion of his miniature car collection to the United States to be used in that café.  And he shipped some of the family's furniture to the United States, including their beds.  As a result, he and the children were forced to sleep on the floor of the Argentine house before moving to the United States.

Petitioner also removed the children from their Argentine school even though a new school year had just begun, and personally brought them to the United States.  It is incredible for the Petitioner to assert that it was never his intention to have the children remain in the United States when he is the person responsible for having brought them here.[8]  Within one week, the children were enrolled in a school in New Jersey.  Petitioner fails to explain why the children were enrolled in a New Jersey school if it was never his intention to stay in the United States.  He also fails to explain why, if he was so adamantly opposed to staying in the United States, he remained for approximately two months during which he helped take care of the children and

---

[8]Although the Petitioner and children traveled from Argentina using round-trip plane tickets, the Court gives the nature of the tickets little weight.  First, the tickets were for a return flight four days after arrival.  Petitioner remained in the United States for approximately two months.  And second, Petitioner's actions prior to and after his arrival belie any intent to only visit the United States.

attempted several times to obtain a New Jersey driver's license.  Even though Petitioner

eventually and unilaterally formed an intent to return to Argentina, that change of mind does not

alter the parents' initial shared intent to make the United States their new habitual residence.  *See*

*Sasson*, 327 F. Supp. 2d at 497 (citing *In re Morris*, 55 F. Supp. 2d 1156, 1162-63 (D. Colo.

1999)).

 In sum, the parties' actions demonstrate a clear and settled purpose to establish a

residence in the United States.  Although they moved to the United States on a conditional rather

than permanent basis, that does not diminish the clear parties' settled intention.  *See Whiting*, 391

F.3d at 550 (stating that "the intent to abandon need not be forever").

 Turning to the first factor – the circumstances surrounding the child's living environment

prior to retention – the Third Circuit has recognized that whether a child has adapted to a new

living environment is a fact-intensive inquiry resolved on a case-by-case basis.  *See Whiting*, 391

F.3d at 546.  The inquiry requires the Court to ascertain whether a child had developed a certain

routine, established a sense of environmental normalcy and formed meaningful connections to

the people and places in that new environment.  *See id.* at 550-51.

 Although the children were living in the United States for a little over two months when

the retention occurred, there is little evidence showing that during that time period they had not

adapted to their new environment.  In *Feder*, the Third Circuit was confronted with determining

the habitual residence of a four-year old named Evan, who had lived in Australia for six months

immediately prior to his retention in the United States.  The Third Circuit concluded that Evan's

habitual residence was Australia, relying primarily on the parents' settled purpose of moving to

Australia.  The Third Circuit did, however, also rely on one aspect of Evan's daily activities,

which is informative of whether the child acclimatized to his environment in Australia – the fact

that he attended preschool – an activity the court characterized as "one of the most central

activities in a child's life." *Feder*, 63 F.3d at 224.

Here, as in *Feder*, the children were enrolled in and regularly attended school in the

United States prior to their retention.  Thus, they participated in one of the activities central to a

child's life upon their arrival to the United States.  Further, by attending school, they had

established a routine and a sense of environmental normalcy that would be expected of a habitual

resident.

Arguably the only fact that would appear to undermine the evidence of adaptation is that

the children spoke only Spanish when they arrived in the United States.  Petitioner, however, has

not produced any evidence demonstrating that this was an impediment to the children's

adaptation within the relevant time frame.  For example, there is no evidence that it hampered the

children's ability to attend school or make friends.  Instead, the only evidence before this Court

concerning the children's performance at school and ability to socialize with their peers shows

that they performed well, were recognized for their adaptation, and made close friends.

Moreover, presumably, upon their arrival and immersion in their new environment, the children

began assimilating by learning English.  Consequently, the Court finds the weight of the evidence

favors concluding that the children acclimatized to the United States immediately prior to their

retention.

In sum, based on the testimony and other evidence presented at trial, the Court concludes

that Petitioner has failed to carry his burden of proving by preponderance of the evidence that the

children's habitual residence was Argentina.  Rather, the Court finds that the children were

habitual residents of the United States.  Consequently, Respondent's retention of the children in the United States was not wrongful under the Hague Convention.

**C.     Even Assuming the Children Were Wrongfully Retained, the Children Are Settled in the United States**

Even if the children were habitual residents of Argentina and Petitioner's custody rights were breached at the time of retention,[9] resulting in the wrongful retention of the children, if the Respondent can establish one of the four affirmative defenses, the Court should not order that they be returned to Argentina.

Respondent asserts the affirmative defense provided by Article 12 of the Hague Convention.  Pursuant to Article 12, if the party opposing the return of the child can show by preponderant evidence that (1) the proceedings under the Hague Convention were commenced more than one year after the date of wrongful retention and (2) the child is settled in his or her new environment, the Court need not order the return of the child.  *See* Hague Convention, Art. 12; 42 U.S.C. § 11603(e)(2)(B).  As recited above, the children were retained in early June 2003. This action was commenced in May 2005.  Thus, the children were retained more than one year prior to the commencement of this action, and Respondent may invoke the Article 12 exception.

In determining whether the "settled" exception applies, the Court should consider any relevant factor informative of the child's connection with his or her living environment.  Those factors include "the age of the child, the stability of the child's residence in the new environment,

---

[9]There is no dispute that, under Argentine law, the Petitioner has rights of custody and that he exercised those rights at the time of retention. (*See* Joint Ex. 4, Article 264 of the Argentine Civil Code).  Further, Respondent does not assert that any time thereafter the Petitioner relinquished his custodial rights.

whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the mother's employment or other means of support, whether the child has friends and relatives in the area, and to what extent the child has maintained any ties to the country of habitual residence." *Koc v. Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001).

Respondent has proved by preponderant evidence that the children are settled in the United States. The children have lived in the same town in New Jersey for two and one-half years. Although they moved once in that time period, they have attended the same school system. At school, they have received good grades and recognition for their work. They are fluent in English and speak English at school and with their friends. The children maintain close friendships in the United States; they meet regularly with those friends and, in some cases, on a daily basis.

Petitioner's primary argument that the children are not settled in the United States is that their relatives live in Argentina. In making that argument, Petitioner relies on the case *Ahumada Cabrera v. Lozano*, 323 F. Supp. 2d 1303 (S.D. Fla. 2004), in which the court found that a child from Argentina who had been living in the United States for two and one-half years was not settled. *Id.* at 1313-15. That case, however, is factually distinguishable.

In *Ahumada Cabrera*, the mother came to the United States with her child on a purported vacation. She then retained the child in the United States. Over the next two and one-half years, the child changed schools once and changed residences approximately five times, apparently because the mother was attempting to prevent the father from locating the child. Although there were positive factors that favored finding the child was settled – the child was happy and doing well, was fluent in English, and maintained good grades – the court found the child was not

17

settled because she lacked a stable environment in the United States. The court gave tremendous

weight to the fact that the mother and child had an uncertain immigration status. As a result of

that status, the chances of the mother securing a long-term, stable job were slim. Further, with an

uncertain immigration status, the child herself faced the threat of deportation. This instability

was exacerbated by the fact that they had moved repeatedly after coming to the United States and

the child's relatives, except for an aunt, all lived in Argentina.

Here, unlike *Ahumada Cabrera*, Respondent and the children are lawfully in the United

States. Their immigration status is certain, at least for the near future. Thus, they do not face the

imminent threat of deportation present in *Ahumada Cabrera*. And even if they did, the Court

need not give the same amount of weight to that factor as the *Ahumada Cabrera* court did. *See*

*Mozes*, 239 F.3d at 1082 n.45 (stating that "an unlawful or precarious immigration status does

not preclude one from becoming a habitual resident under the [Hague] Convention") (citing E.M.

Clive, *The Concept of Habitual Residence*, 1997 Jurid. Rev. 137, 147). Further, as stated above,

the children have lead a rather stable life in the United States, moving only once and always

attending the same school system over two and one-half years. Moreover, there are no

allegations that Respondent has tried to frustrate Petitioner's attempts to locate his children. On

the contrary, Petitioner has always known where his children were located and has visited them

many times over the last several years. In short, the Respondent has demonstrated that the

children have significant connections to their environment in the United States and, therefore, the

Court concludes they are well-settled in the United States. *See Diaz Arboleda v. Arenas*, 311 F.

Supp. 2d 336, 343 (E.D.N.Y. 2004); *Neng Nhia Yi Ly v. Heu*, 294 F. Supp. 2d 1062, 1066-67 (D.

Minn. 2003).

## CONCLUSION

For the foregoing reasons, Petitioner Silvestri's petition for the return of his children to

Argentina is denied.


**Dated:**  December 7th, 2005                          s/ William J. Martini
                                                          **William J. Martini, U.S.D.J.**